```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

STEPHEN KANIZAJ,                    :
                                    :
     Plaintiff,                     :
                                    :
v.                                  :   CASE NO. 3:15cv949(DFM)
                                    :
BRIANNA SANTELLO, ET AL.,           :
                                    :
     Defendants.                    :
```

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Stephen Kanizaj, brings this civil rights complaint against several Old Saybrook police officers[1] pursuant to 42 U.S.C. § 1983 alleging that they violated his Fourth Amendment right to be free from unreasonable searches and seizures.  Pending before the court is defendants' motion for summary judgment. (Doc. #44.)  For the reasons set forth below, the motion is GRANTED.[2]

I.   Factual Background

The following facts, drawn from the parties' Local Rule 56(a) statements and exhibits, are undisputed.

---

[1] In his original complaint, plaintiff named Brianna Santello, Michael Small, John Doe, and James Doe as defendants. (Doc. #1.)  By way of his amended complaint (doc. #34), plaintiff dismissed the action as to defendant Santello and substituted "Patrolman Miller," Robbert van der Horst, and James Forte for the Doe defendants.

[2] This is not a recommended ruling.  On March 11, 2016, the parties consented to the jurisdiction of a magistrate judge. Doc. #38; see 28 U.S.C. § 636(c); Fed.R.Civ.P. 73(b).

On April 15, 2014, at approximately 4:41 PM, the Old Saybrook Police Department received a call[3] from an individual who identified himself as "James Brink." (Defendants' Local Rule 56(a)(1) Statement of Facts ("Def. SOF"), Doc. #44-2, ¶¶ 1, 4; Plaintiff's Local Rule 56(a)(2) Statement ("Pl. SOF"), Doc. #45-1, ¶¶ 1, 4.)  The caller stated, "I'm hearing gunshots from across the street."  (Audio Recording, Def. Ex. A; Def. SOF ¶ 2; Pl. SOF ¶ 2.)  He explained, "I'm just down the street, but the location of where the gunshots are . . . coming from is 225 Springbrook Road."  (Audio Recording, Def. Ex. A; Def. SOF ¶ 3; Pl. SOF ¶ 3.)  Plaintiff lives at 225 Springbrook Road.  (Def. SOF ¶ 23; Pl. SOF ¶ 23.)

The caller continued that "this happened about two minutes ago.  I just keep hearing gunshots and screaming, I'm just scared right now."  (Audio Recording, Def. Ex. A; Def. SOF ¶¶ 5, 11; Pl. SOF ¶¶ 5, 11.)  He stated that he was "looking through the window" and could "see people with guns pointed to people's heads."  (Audio Recording, Def. Ex. A; Def. SOF ¶¶ 6, 9; Pl. SOF ¶¶ 6, 9.)  Police were dispatched to the scene.  (Audio Recording, Def. Ex. A.)  The caller reported that there were two armed individuals wearing black ski masks and "a whole family on

---

[3]This was not a 911 call--the call was made directly to the Old Saybrook Police Department.  (Def. SOF ¶ 1; Pl. SOF ¶ 1.)

the floor." (Audio Recording, Def. Ex. A; Def. SOF ¶ 14; Pl. SOF ¶ 14.) When asked if any shots had been fired, the caller informed the dispatcher that about five shots were fired. (Audio Recording, Def. Ex. A; Def. SOF ¶ 8; Pl. SOF ¶ 8.) He told the dispatcher, "I think someone's been shot in the leg" and that "there are only a couple alive." (Audio Recording, Def. Ex. A; Def. SOF ¶¶ 16, 17; Pl. SOF ¶¶ 16, 17.) When asked what the people were doing, the caller answered, "they are just lying on the floor with blood coming out." (Audio Recording, Def. Ex. A; Def. SOF ¶ 18; Pl. SOF ¶ 18.)

The dispatcher informed the responding officers by radio that the caller heard gunshots, that there were people in the house with guns to their heads, and that the caller could hear screaming. (Audio Recording, Def. Ex. A; Def. SOF ¶¶ 7, 10, 12; Pl. SOF ¶¶ 7, 10, 12.) She relayed the caller's report that one to three people possibly had been shot in the leg and that he saw blood. (Audio Recording, Def. Ex. A; Def. SOF ¶ 19; Pl. SOF ¶ 19.)

Police arrived on Springbrook Road about 6 minutes and 20 seconds after the start of the call. (Audio Recording, Def. Ex. A; Def. SOF ¶ 13; Pl. SOF ¶ 13.) The officers were wearing tactical gear. (Pl. Depo., Def. Ex. B, Doc. #44-4, p. 11; Def. SOF ¶ 33; Pl. SOF ¶ 33.) Plaintiff was standing in his kitchen

3

when his adult son alerted him that there were police officers in their backyard. (Pl. Depo., Pl. Ex. 1, Doc. #45-2, pp. 4-5.) Plaintiff went to the back screen door and an officer told him to come out of the house. (Id. at 5.) Plaintiff asked if he could put on sneakers or take his socks off because it was wet outside.[4] (Id.) The officer responded that he could take his socks off. (Id. at 7; Def. SOF ¶ 30; Pl. SOF ¶ 30.) Plaintiff did so and came outside. (Pl. Depo., Pl. Ex. 1, Doc. #45-2, p. 5.)

Some of the officers asked plaintiff questions that "didn't make sense" to him. (Id.) One officer asked plaintiff if he had heard a car backfiring, another asked if he had heard shots being fired, and another asked if someone had been shot in the front yard. (Id. at 8.) Plaintiff "didn't know what was going on," and responded that he had not heard a car backfire or any shots being fired. (Id. at 5, 8.) When asked if anyone else was in the house, plaintiff responded that his son was inside. (Id. at 5.) An officer asked plaintiff to tell his son to come outside. (Id.) Plaintiff's son came outside and they stood on the porch against the exterior wall of the house. (Id.)

---

[4] It was "a mild day, drizzling." (Pl. Depo., Pl. Ex. 1, Doc. #45-2, pp. 8, 11.)

An officer asked plaintiff for permission to enter the house. (Id.) Plaintiff refused, telling the officer, "[y]ou have no right to go in my home." (Id.) The officer entered anyway. (Id.) Another officer, defendant Small,[5] pointed his rifle at plaintiff, keeping him "covered for the safety of the other officers." (Pl. Depo., Pl. Ex. 1, Doc. #45-2, pp. 5, 7; Def. SOF ¶ 29; Pl. SOF ¶ 29.) Plaintiff told Officer Small that he wanted to accompany the officer. (Id. at 6.) Officer Small told plaintiff that he had to stay outside. (Id.) Some time later, a female officer also entered the house. (Id.) These were the only officers who entered plaintiff's house. (Id.) Plaintiff estimates that the officers were inside for "[p]robably 15 minutes." (Id.)

During the search, the officers turned on every light and opened every interior door--"closet doors, bedroom doors, basement door." (Pl. Depo., Pl. Ex. 1, Doc. #45-2, p. 9; Pl. SOF ¶ 25.) The officers did not open any drawers. (Pl. Depo., Pl. Ex. 1, Doc. #45-2, p. 9.) The officers did not cause any damage to plaintiff's house. (Pl. Depo., Pl. Ex. 1, Doc. #45-2, p. 9; Pl. SOF ¶ 25.) At no time did the defendants handcuff

---

[5] Plaintiff could not testify as to the names of the officers involved in the incident. He knows only Officer Small by name because he gave plaintiff his business card after the incident. (Pl. Depo., Pl. Ex. 1, Doc. #45-2, pp. 6, 8.)

5

plaintiff or otherwise physically contact him.  (Pl. Depo., Pl. Ex. 1, Doc. #45-2, p. 12; Def. SOF ¶¶ 31, 32; Pl. SOF ¶¶ 31, 32.)

Upon completion of the investigation, the defendants found nothing that supported the allegations made by the caller. (Small Aff., Def. Ex. C, Doc. #44-5, ¶ 8; Police Report, Def. Ex. D, Doc. #44-6, pp. 5-6; Def. SOF ¶ 34; Pl. SOF ¶ 34.)  It later was determined that plaintiff was the victim of "swatting."[6]  (Police Report, Def. Ex. D, Doc. #44-6, p. 6.)

   II.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is a fact that influences the case's outcome under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A "genuine" dispute is one that a reasonable jury could resolve in favor of the non-movant. Id.  The moving party bears the initial burden of establishing that there are no genuine disputes as to any material fact.

---

[6]"A 'swatting 911 call' is a false 911 call made to police in which a false report of a violent crime is made to elicit a police Special Weapons and Tactics squad ('SWAT') response to the physical address of a targeted individual, his or her family members, or place of employment."  United States v. Neff, No. 3:11-CR-0152-L, 2013 WL 30650, at *3 (N.D. Tex. Jan. 3, 2013).

Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). Once such a showing is made, the non-movant must show that there is a genuine issue for trial. Id. The court may rely on admissible evidence only, Spiegel v. Schulmann, 604 F.3d 72, 81 (2d Cir. 2010), and must view the evidence in the record in the light most favorable to the non-movant, drawing all reasonable inferences in that party's favor. Weinstock, 224 F.3d at 41.

III. Discussion

A. Exigency

The Fourth Amendment protects the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. "It is a basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are presumptively unreasonable." Brigham City v. Stuart, 547 U.S. 398, 403 (2006) (internal quotation marks omitted). "[T]his presumption may be overcome in some circumstances because [t]he ultimate touchstone of the Fourth Amendment is reasonableness." Kentucky v. King, 563 U.S. 452, 459 (2011) (internal quotation marks omitted).

> [T]he warrant requirement is subject to certain reasonable exceptions . . . . One well-recognized exception applies when the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the

7

> Fourth Amendment . . . . [The Supreme] Court has identified several exigencies that may justify a warrantless search of a home . . . . Under the "emergency aid" exception, for example, officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury . . . .

Id. at 460 (citations and internal quotation marks omitted); see also Brigham City at 403 ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.") (internal quotation marks omitted). Under the "emergency aid" exception, "[c]ourts must apply an objective standard to determine the reasonableness of the officer's belief, taking into account the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." Mayes v. Vill. of Hoosick Falls, 162 F. Supp. 3d 67, 80 (N.D.N.Y. 2016) (citations and internal quotation marks omitted).

Here, it is undisputed that the Old Saybrook Police Department received a call from an individual who gave identifying information and stayed on the line to provide updated details as the incident purportedly developed. The caller reported an armed home invasion at a specific address--plaintiff's house. He stated that he saw masked gunmen holding a family at gun point, firing shots, and injuring some of the

victims.  At the time the officers responded and entered plaintiff's house, they reasonably believed that a home invasion was in progress.  Thus, the officers were "confronted with an urgent need to render aid or take action."  Moore v. Andreno, 505 F.3d 203, 213 (2d Cir. 2007) (internal quotation marks omitted).  Only after the search was it determined that plaintiff was the victim of swatting.

Plaintiff's sole argument in opposition to summary judgment is that once he "was in custody, there simply was no evidence of ongoing exigent circumstances sufficient to obviate the warrant requirement."  (Pl. Br., Doc. #45, p. 2.)  The fact that plaintiff and his son exited the house and proclaimed that no one else was inside did not pacify the exigency of the situation or the need to search the house for potential suspects and victims.  See, e.g., Canady v. Jackson, No. 307-CV-01843 (CSH), 2010 WL 3925132, at *6 (D. Conn. Sept. 29, 2010) ("Even if the plaintiff was alone in the home, and explained as much to the police, the 911 call gave more than enough cause for concern that she might be lying, under duress, in order to make the police go away.  It is undisputed that they . . . performed only the most basic sweep of the premises, which was concluded in a matter of minutes.").  The court

appreciate[s] the risk of a "false positive" emergency call and recognize[s] that a show of police force in response to a prank call is a substantial intrusion on the lives of the prank's victims.  It is the nature of our own assessments of what constitutes an emergency that the police will routinely be summoned for matters that are not, in some objective sense, real emergencies.  We will not impose a duty of inquiry on the police to separate a true cry for help from a less deserving call for attention because the delay may cost lives that could have been saved by an immediate police response.  The possibility that immediate police action will prevent injury or death outweighs the inconvenience we suffer when the police interrupt our ordinary routines in response to what turns out to be a non-emergency call.

U.S. v. Snipe, 515 F.3d 947, 953-54 (9th Cir. 2008).

Considering the substance of the call, the officers' entry and limited search of plaintiff's house and their temporary seizure of plaintiff were reasonable under the Fourth Amendment.  No rational jury could find otherwise.  Construing the evidence in the light most favorable to plaintiff, the defendants' search took fifteen minutes and was limited to areas where gunmen or victims could be found.[7]  The officers conducted a cursory search

---

[7]Once an officer enters a residence under the emergency aid exception, he may properly conduct a limited search of the premises if it is objectively reasonable for him to believe that the search is necessary to ensure the safety of someone therein.  The search must be strictly circumscribed by the exigencies which justify its initiation . . . .  As to what may be done by the police or other public authorities once they are inside the premises, this must be assessed upon a case-by-case basis, taking into account the type of emergency which appeared to be present . . . .  The officer's post-entry conduct must be carefully limited to achieving the

10

of plaintiff's house, turning on lights and opening interior doors. On this record, defendants' actions were objectively reasonable under the Fourth Amendment.[8]

IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment (doc. #44) is GRANTED.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. See 28 U.S.C. § 636(c)(3); Fed.R.Civ.P. 73(c).

---

objective which justified the entry—the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance and to provide that assistance.

Mayes, 162 F. Supp. 3d at 81 (citations and internal quotation marks omitted).

[8]In light of this conclusion, the court need not address defendants' qualified immunity defense. See, e.g., Nelson v. City of Stamford, No. 3:09-CV-1690(VLB), 2012 WL 233994, at *28 (D. Conn. Jan. 25, 2012) ("Having found that no constitutional violation occurred, the Court need not address the Defendants' claims of qualified immunity."); Morris v. Valeriano, No. 3:06-CV-392(JCH), 2007 WL 1851167, at *6 (D. Conn. June 26, 2007) (finding no constitutional violation and granting summary judgment, district court "need not address the defendants' qualified immunity defense.").

11

SO ORDERED at Hartford, Connecticut this 6th day of February, 2017.

_____/s/_____
Donna F. Martinez
United States Magistrate Judge